Ernest DaCOSTA, Appellant,

v.

Melvin LAIRD, Individually and as Secretary of Defense, et al., Appellees.

No. 216, Docket 72–1743.

United States Court of Appeals,
Second Circuit.

Argued Dec. 15, 1972.

Decided Jan. 17, 1973.

Burt Neuborne, New York City (Leon Friedman, New York Civil Liberties Un-

ion, New York City, on the brief), for appellant.

James D. Porter, Jr., Asst. U. S. Atty., E. D. New York (Robert A. Morse, U. S. Atty., L. Kevin Sheridan and Cyril Hyman, Asst. U. S. Attys., E. D. New York, on the brief), for appellee.

Before KAUFMAN, ANDERSON and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon to decide the very specific question whether the Secretary of Defense, the Secretaries of the Army, Navy and Air Force, and the Commander of American military forces in Vietnam,[1] may implement the directive of the President of the United States, announced on May 8, 1972, ordering the mining of the ports and harbors of North Vietnam and the continuation of air and naval strikes against military targets located in that battle-scarred land. The appellant seeks a declaratory judgment[2] that the military operations undertaken pursuant to that directive are unlawful in the absence of explicit Congressional authorization, and asks for what he terms "appropriate equitable relief." Like any American with the most rudimentary knowledge of the political history of this Nation, we are aware of the familiar adage that "[s]carcely any political question arises in the United States that is not resolved, sooner or later, into a judicial ques-

tion."[3] We fear, however, that deTocqueville's apothegm loses some of its force with age and over-use and, like all generalizations, is of interest as much for the situations it fails to describe as for those it accurately characterizes. Unless deTocqueville believed that "judicial resolution" embraced a determination by the courts that they lack the power to resolve a political question, we are of the view that this case would prove an exception to his observation.

On another occasion, this Court acting within its powers and duties under the Constitution, has been obliged to rule on the legality of the war in Vietnam, Orlando v. Laird, 443 F.2d 1039 (2nd Cir.), cert. denied 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971). Here, however, the appellant[4] invites us to extend the reach of judicial inquiry with respect to the Vietnam war into the domain of tactical and strategic military decisions ordered by the President in his capacity as Commander-in-Chief of the Armed Services. The district court denied DaCosta's motion for summary judgment and for injunctive relief under Rules 56 and 65, F.R.Civ.P. In our view, the matter pressed by DaCosta in this case is a nonjusticiable political question. Accordingly, we remand to the district court with instructions that the complaint be dismissed.

I.

Ordinarily, we preface our discussion of the legal issues in a case with a reci-

---

1. The President of the United States was initially named as a defendant in this action. The district court dismissed as against the President, seemingly without objection from the appellant. In any event, DaCosta here does not argue the propriety of dismissal with regard to the President and we do not address that question.

2. 28 U.S.C. § 2201 provides:
 In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether

or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

3. DeTocqueville, 1 Democracy in America 280 (1945).

4. DaCosta is no stranger to our Court, see DaCosta v. Laird, 448 F.2d 1368 (2nd Cir. 1971), cert. denied 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972); and DaCosta v. Laird, unpublished Memorandum and Order, Docket No. 72 C. 207 (E.D.N.Y. February 16, 1972), aff'd without opinion, DaCosta v. Laird, 456 F.2d 1335 (2nd Cir. 1972).

tation of the underlying facts. Even that threshold task is made difficult in a matter such as this, where the "facts" concerning the methods employed in waging war are difficult to sift, *sui generis* in nature and not of a kind ordinarily involved in framing a question for judicial resolution. Indeed, the difficulty encountered by a domestic judicial tribunal in ascertaining the "facts" of military decisions exercised thousands of miles from the forum, lies at the heart of the determination whether the question is a "political" one, *see* United States v. Sisson, 294 F.Supp. 515 (D. Mass.1968); where there are serious doubts concerning a court's power or fitness to decide the question raised, the political question doctrine may come into play.

The following, however, may be stated with relative certainty. The appellant, Ernest DaCosta, is a United States citizen, and was, at the time he commenced his action on May 11, 1972, a Specialist Fourth Class in the United States Army, stationed in Vietnam as a machine gunner, and assigned to combat duty.[5] His complaint focuses upon military operations undertaken by the United States government pursuant to an executive directive announced to the public by the President in a television and radio address on May 8, 1972. The "record" in this case, to the extent it provides us with a factual context in which to set the dispute presently before us, consists of DaCosta's complaint, the government's answer, supporting affidavits submitted by each side, and the text of two addresses delivered by the President in the spring of 1972. From this skimpy fare, although the events were matters of great public moment, and hence wide-spread coverage, we have attempted to reconstruct the following narrative.

In early April, 1972, apparently at the start of a new "spring offensive," three North Vietnamese divisions crossed the demilitarized zone into South Vietnam. Shortly thereafter, three additional divisions of communist troops crossed the South Vietnamese border at points further south. On April 25, it was announced that an agreement had been reached to resume plenary sessions of the Paris "peace talks," with the first meeting of the negotiations scheduled to be held on April 27, 1972. The evening before these negotiating sessions were to resume, President Nixon addressed the Nation over radio and television from his office in the White House. The President's stated purpose was to give "a firsthand report on the military situation in Vietnam, the decisions I have made with regard to the role of the United States in the conflict and the efforts we are making to bring peace at the negotiating table." The President began by noting that American troop strength, numbering 549,000 men in January 1969, had been sharply reduced over a period of three and one-half years to 69,000 men and that casualty rates had been cut by 95%. He noted what he described as the administration's most recent proposals for a negotiated peace—including a cease fire, exchange of prisoners of war, withdrawal of forces and internationally supervised elections in South Vietnam—terms he said he believed were "generous." The President then commented on the presence of more than 120,000 North Vietnamese troops in South Vietnam; that presence, he said, marked "a clear case of naked and unprovoked aggression across an international border." The President reviewed an evaluation of the military situation in Indochina submitted by General Creighton Abrams, commander of American Troops in South

5. We were informed by counsel, in their briefs and during argument, that subsequent to commencing this action DaCosta was returned to the United States for treatment of an infected cyst and, pursuant to Army Regulations, was reassigned to duty in the United States. DaCosta has since been separated from active duty in the Army, and is now assigned to the United States Army Reserve Control Group (annual training). It appears that DaCosta could be called to involuntary active duty only in the event of Special Congressional or Executive action.

Vietnam, which predicted that the enemy offensive would ultimately prove unsuccessful. Based upon his assessment of the military situation, President Nixon announced that the policy of "Vietnamization" was proceeding according to schedule and that an additional 20,000 American troops would be recalled within two months, lowering the troop ceiling to 49,000 men by July 1. Among other announcements, the President noted that air and naval attacks against military installations in the North would be continued. He stated:

> We are not trying to conquer North Vietnam or any other country in this world. We want no territory. We seek no bases. We have offered the most generous peace terms—peace with honor for both sides—with South Vietnam and North Vietnam each respecting the other's independence.

The President said he could see the day when no more Americans would be involved in Vietnam, and urged the Nation to remain "steadfast" as "we come to the end of this long and difficult struggle."

Less than two weeks later, on May 8, 1972, the President again addressed the Nation in a television and radio broadcast. He began by discussing the "massive invasion" launched by the North Vietnamese in early April, "an invasion," he said "that was made possible by tanks, artillery and other advanced offensive weapons supplied to Hanoi by the Soviet Union and other Communist nations." The President commented on the mounting number of casualties, and noted that America's response had nonetheless been restrained. He pointed out that the United States had resumed negotiations at Paris, and that Dr. Henry Kissinger, in meetings with Soviet leaders for four days beginning on April 20, 1972, had learned of a new Russian interest in bringing the war to a speedy close. The President outlined the content of peace officers made to the North Vietnamese, and stated that "North Vietnam has met each of these offers with insolence and insult. They have

flatly and arrogantly refused to negotiate an end to the war and bring peace. Their answer to every peace offer we have made has been to escalate the war." The President then said:

> There are only two issues left for us in this war. First, in the face of a massive invasion do we stand by, jeopardize the lives of 60,000 Americans, and leave the South Vietnamese to a long night of terror? This will not happen. We shall do whatever is required to safeguard American lives and American honor.
>
> Second, in the face of complete intransigence at the conference table do we join with our enemy to install a communist government in South Vietnam. We will not cross the line from generosity to treachery.
>
> We have now a clear, hard choice among three courses of action: Immediate withdrawal of all American forces, continued attempts at negotiation, or decisive military action to end the war.

The President rejected the first alternative—immediate withdrawal—because in his view it would leave world peace in "grave jeopardy." He stated that the second course—negotiations—was preferred, and that America would continue to seek a negotiated settlement; but he claimed that North Vietnam's "arrogant" refusal to negotiate in good faith made this course unavailing. In addition, sole reliance on negotiations, he said, would give the enemy "the time he needs to press his aggression on the battlefield." Therefore, the President concluded that the only way "to stop the killing" was to interdict the supply of weapons flowing into the hands of the North Vietnamese. He went on to say:

> In these circumstances, with 60,000 Americans threatened, any President who failed to act decisively would have betrayed the trust of his country and betrayed the cause of world peace.
>
> I therefore concluded Hanoi must be denied the weapons and supplies it needs to continue the aggression. In

full coordination with the Republic of Vietnam I have ordered the following measures which are being implemented as I am speaking to you.

All entrances to North Vietnamese ports will be mined to prevent access to these ports and North Vietnamese naval operations from these ports. United States forces have been directed to take appropriate measures within the internal and claimed territorial waters of North Vietnam to interdict the delivery of any supplies. Rail and all other communications will be cut off to the maximum extent possible. Air and naval ·strikes against military targets in North Vietnam will continue.

The President said that all neutral nations had been given notice and that the military operations just announced would cease upon release of American prisoners of war and upon commencement of an internationally supervised cease-fire. He gave notice to the world that the military operations on which the United States was embarking were aimed solely at North Vietnam, and no other nation. He stated:

> Their sole purpose is to protect the lives of 60,000 Americans who would be gravely endangered in the event the Communist offensive continues to roll forward and to prevent the imposition of a Communist government by brutal aggression upon 17 million people.

## II.

A preliminary dispute concerning DaCosta's standing to sue has been raised in this case, and since the Government asks us to dismiss this appeal and the underlying action for lack of subject-matter jurisdiction, we believe it appropriate to address that question at the threshold.

█ Judge Dooling concluded that DaCosta met the necessary standing conditions required by Article III, Section 2 of the Constitution, which provides that the judicial power shall extend only to "cases" and "controversies." The district judge was of the view that DaCosta's standing did not depend on his military status but rather that "plaintiff, any member of the military, *and any citizen,* all alike exposed to mortal risk in war, has standing to challenge the validity of action by which large scale international combat or a new departure in belligerency is initiated." (emphasis supplied). Wholly apart from the difficulty, if not the impossibility, of reaching agreement as to the meaning of phrases such as "large scale international combat" or "new departure in belligerency," we believe that the general rule announced below is without support in law. In Pietsch v. President of the United States, 434 F.2d 861 (2nd Cir. 1970), cert. denied 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971), we held that a citizen-taxpayer was without standing to challenge the constitutionality of the Vietnam war and that the necessary nexus announced as the test for standing in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), a case relied upon by the district judge in this action, had not been established.[6] The Tenth Circuit, in Vel-

---

6. In *Flast,* Chief Justice Warren, speaking for the Court, noted:

 "[T]he nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute . . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to

vel v. Nixon, 415 F.2d 236 (10 Cir. 1969), cert. denied, 396 U.S. 1042, 90 S. Ct. 684, 24 L.Ed.2d 686 (1970), reached a similar result with respect to an attack upon the validity of the war raised by a professor of constitutional law in his capacity as a citizen and taxpayer. Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971), also relied upon by the district court, is, in our view, inconclusive. There the Court noted that in addition to the Commonwealth of Massachusetts, "[t]he individual plaintiffs are residents of Massachusetts and members of the United States forces who are either serving in Southeast Asia or are subject to such service." 451 F.2d at 28. After noting its own doubt whether the Commonwealth of Massachusetts had standing to sue,[7] the court declined to decide that question, since it believed in any event, that "some of the plaintiffs are properly before us." Id. at 29. Exactly which plaintiffs were "properly before the Court," was not clarified, but the panel did shed some light when it found no merit "in the claim that the individual plaintiffs, particularly those serving in Southeast Asia, lack standing." To the extent the standing issue in Massachusetts v. Laird, supra, may have been resolved on the ground that persons ordered to duty in Vietnam may properly challenge the constitutionality of the war effort there, this Court is in full

agreement, and has said so in the past, see Berk v. Laird, 429 F.2d 302 (2nd Cir. 1970); Orlando v. Laird, supra.[8] In any event, Massachusetts v. Laird, supra, like Orlando v. Laird, supra, hardly sustains the citizen-wide view of standing adopted by the district court. Those cases support the proposition that a soldier with orders to report for duty in a war-zone has standing to challenge the constitutionality of the war. But, that question is not now before the Court—as appellant concedes. DaCosta, instead, presses the more limited question whether within the context of a lawful war, the President's order to mine the harbors of North Vietnam was properly authorized. Since we have stated, in Pietsch, that a citizen-taxpayer does not have standing to challenge the constitutionality of the Vietnam war, it is difficult for us to understand how such a citizen-taxpayer would have standing to challenge specific military orders issued in furtherance of the war effort. It is true, as Judge Dooling indicated in his opinion in this case, that a California district court has upheld the standing of Army Reservists not stationed in Vietnam to challenge military operations associated with the Cambodian "incursion" of 1970, Mottola v. Nixon, 318 F.Supp. 538, 546–548 (N.D.Cal. 1971).[9] But, that decision was reversed

Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction." 392 U.S. at 102–103, 88 S.Ct. at 1954.

7. The Court said: "We do not see, however, that Massachusetts achieves any special status as a protector of the rights of its citizens, solely as United States citizens, and not as a sovereign with unique interests. [citations omitted]. The traditional rationale is that the federal government is 'the ultimate parens patriae of every American citizen.' [citation omitted]. This admittedly seems inappropriate in a suit challenging the constitutionality of a war waged by the putative parens." 451 F.2d at 29.

8. We feel confident that the standing ruling in Massachusetts v. Laird, supra, is limited in the manner we have suggested, particularly in view of the Court's citation to our decision in Berk v. Laird, supra, precisely at that point in its opinion where it announced that some of the individual plaintiffs had standing. 451 F.2d at 29.

9. We believe the district court opinion in Mottola undermines rather than bolsters the argument advanced by the district court in this case, for it appears that the district judge in Mottola believed he was adjudicating the constitutionality of the war rather than the legitimacy of tactical military decisions made by the President as Commander-in-Chief. The judge's view was:

Although the complaint is directed in terms only at the Cambodian military

by the Ninth Circuit Court of Appeals, after Judge Dooling's reliance on the district court opinion, on the precise issue of standing. Mottola v. Nixon, 464 F.2d 178 (9th Cir., 1972).

We are left then without any authority that either directly or inferentially substantiates the district judge's conclusion that any citizen has standing to challenge the legality of military decisions ordered by the President in his capacity as Commander-in-Chief. We are, on the contrary, confronted with a number of cases that have decided that even where the challenge is to the legality of a war, rather than specific tactical military decisions, something other than taxpayer status must be alleged.

 Yet, although the district court may have erred in its broad statement of the law on standing, since at the time this action was commenced DaCosta was actually in combat duty in Vietnam, it is argued that the narrower principles of standing announced in our decisions in Berk v. Laird, *supra,* and Orlando v. Laird, *supra,* might be applicable. But since we are of the view that the substantive issue presented to us is a non-justiciable political question, we need not address any further the issue of this plaintiff's standing to present the question. The Supreme Court instructed us recently in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) that what has been traditionally referred to as the question of standing, necessarily involves analysis of "whether a party has a sufficient stake in an *otherwise justiciable controversy* to obtain judicial resolution of that controversy . . . ." 405 U.S. at 731–732, 92 S.Ct. at 1364 (emphasis supplied). In sum, the standing of a party need not come into question if a court determines that for other reasons the issue raised before the bench is non-justiciable. The district court, it appears, believed that the issue raised by *Da-Costa* was a justiciable question. Accordingly, it felt compelled to resolve the question of standing. We, however, are of the view that the issue raised in these proceedings is a political question which the court is without power to hear. Thus, the non-justiciable nature of the dispute not merely obviates, but logically precludes, resolution of the question of plaintiff's standing to sue, and we must decline the government's request that we both address and decide that issue.[10]

## III.

Scholars have written extensively about the political question doctrine.[11]

operation, that issue necessarily involves the constitutionality of the whole Vietnam war. This is so because, if our South Vietnam presence and operation are lawful, then, certainly, any necessary incidental, tactical incursion ordered by the Commander in Chief against dangerous, threatening enemy strongholds across the Cambodian border to protect our South Vietnam forces from attack would likewise be lawful; if, on the other hand, the Vietnam operation, itself, is unlawful then all its actions, including its Cambodian operation, would be unlawful.
318 F.Supp. at 540.

10. Standing is an aspect of justiciability, *see* Flast v. Cohen, *supra,* 392 U.S. at 98, 88 S.Ct. 1942. Unlike the political question doctrine, which focuses on the nature of the *issue* presented to the court, questions of standing focus on the nature of the *party* seeking a judgment. The two doctrines are thus, at once, analytically separable and, in certain circumstances, closely linked. Thus, "a party may have standing in a particular case, but the federal court may nevertheless decline to pass on the merits of the case because, for example, it presents a political question." Id. at 100, 88 S.Ct. at 1952. Such occasion might arise if the dismissal on the political question grounds is discretionary. But if, for example, no judicially discoverable and manageable standards exist for resolution of the question presented to the court, it may very well be that no one has standing to sue. In such a case, the non-justiciability of the question requires dismissal of the action wholly apart from any consideration of the question of standing.

11. *See, e. g.,* Tigar, Judicial Power, the "Political Question Doctrine" and Foreign Relations, 17 U.C.L.A.L.Rev. 1135 (1970); Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 62–77 (1969).

Those who have explored and analyzed the doctrine divide themselves into a variety of schools of thought on the subject.[12] One student comment has boldly stated that "the [political question] doctrine has defied formulation despite numerous attempts to systematize it." Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 63 (1969). We receive our guidance, nevertheless, from the Supreme Court. Although each case clearly must turn on its own facts, certain general principles emerge from the relevant cases, see, e. g., Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Of primary significance is the principle that "[t]he nonjusticiability of a political question is primarily a function of the separation of powers." Baker v. Carr, supra, 369 U.S. at 210, 82 S. Ct. at 706. Thus, "in 'political question' cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" Ibid. In Baker v. Carr, supra, after reviewing previous cases involving consideration of the political question doctrine the Court synthesized its decisions in the following language:

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Id. at 217, 82 S.Ct. at 710.

Clearly, some of the principles enumerated call for discretionary judgments that will not always require a court to refrain from action. Nevertheless, we are at a loss to understand how a court may decide a question when there are no judicially discoverable or manageable standards for resolving it. While in

An interesting debate over different interpretations of the doctrine may be traced in Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1 (1959); Bickel, The Least Dangerous Branch (1962); and Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517 (1966).

12. Some are of the view that the Court must decide all cases which are properly before it, and that discretion in the exercise of jurisdiction is forbidden by the Constitution. The only circumstance in which a court may decline to hear a matter is when constitutional jurisdictional requisites have not been met, or when the "Constitution has committed to another agency of government the autonomous determination of the issue raised . . . . ." Wechsler, supra n. 10, at 8. Others view

application of the political question doctrine as a matter of judicial discretion, not of constitutional compulsion, and argue that there are matters so controversial and inappropriate for judicial resolution that courts follow a wiser course by abstaining, see Bickel, supra, n. 10. This approach, as Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) attest, has not been favored by the Supreme Court. Still others, see Scharpf, supra, note 10, seek to establish categories of cases or concerns which have previously invoked application of the political question doctrine, and indicate that when the objective achieved by a court in refraining from deciding a case is important, the political question doctrine will be a means of achieving that objective.

certain instances there may be a dispute among judges whether such standards exist, where all agree that standards are presently unavailable, the court has no alternative but to dismiss for lack of jurisdiction. This conclusion is not reached by the exercise of discretion, but rather of necessity.

We have set forth the legal framework of the issue *in extenso* in order that the problem presented to us may be viewed in the proper perspective. We inquire at the outset, therefore: what is the question we are asked to decide? On the one hand, DaCosta concedes that "this appeal does not—and should not—question the wisdom, propriety or morality of Executive acts of war against North Vietnam. Such questions must be resolved, not by the courts, but by the political branch of government entrusted by the Constitution with the awful responsibility to act upon such matters." Furthermore, we are told that the appeal does not challenge the constitutionality of the war as it was prosecuted prior to the mining of North Vietnam's harbors. Indeed, such a claim would clearly prove fruitless in light of the Court's earlier decision in Orlando v. Laird, *supra*, holding that there has been participation by Congress sufficient to authorize and ratify American military activity in Vietnam, 443 F.2d at 1042–1044 and our decision in the first *DaCosta* case, 448 F.2d 1368 (2nd Cir. 1971), cert. denied 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972), which held that repeal of

the Tonkin Gulf Resolution did not nullify Congressional support for the war. The gravamen of this appeal must be, therefore, that the President's conduct has so altered the course of hostilities in Vietnam as to make the war as it is currently pursued different from the war which we held in *Orlando* and *DaCosta* to have been constitutionally ratified and authorized by the Congress, or that Congressional ratification and authorization has terminated.

▪ Appellant argues that the President's unilateral order to mine the harbors of North Vietnam lacked the "mutual participation" of which we spoke in *Orlando*. We do not understand appellant to argue that every tactical decision made by the President is subject to challenge under the theory advanced in this case. Any such contention would necessarily be unpersuasive in light of the Constitution's specific textual commitment of decision-making responsibility in the area of military operations in a theatre of war to the President, in his capacity as Commander in Chief.[13] What is unique about the President's action presently under consideration, according to DaCosta, is the "unilateral escalation" involved in the decision. With this characterization in hand, the appellant draws on language in DaCosta v. Laird, 448 F.2d 1368 (2nd Cir. 1971), where we said, "[i]f the Executive were now escalating the prolonged struggle instead of decreasing it, additional supporting action by the Legislative Branch

13. Article II, § 2, of the Constitution provides, in part:

"The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States . . . ."

The clause, at least with respect to the President's function as Commander-in-Chief of the Army and Navy, seemed self-explanatory to the Framers and required little discussion at the Convention. What little debate there was, centered on the question whether the President would have the authority to take personal command of troops in the field, a question that was

answered in the affirmative. *See*, Luther Martin, The Genuine Information, Delivered to the Legislature of the State of Maryland, Relative to the Proceedings of the General Convention, Held at Philadelphia, in 1787 (1787), printed in 3 Farrand, The Records of the Federal Convention of 1787 at 172, 217–18. ("Objections were made to that part of this article, by which the President is appointed Commander-in-Chief of the army and navy of the United States and the militia of the several states, and it was wished to be so far restrained, that he should not command in person; but this could not be obtained.") *See also*, 1 Farrand, *supra*, at 244.

over what is presently afforded, might well be required," *Id.* at 1370, and argues that the "escalation" represented by the order to mine North Vietnam's harbors is illegal because unsupported by additional Congressional authorization.

▪▪ The district court approached this problem by asking whether the actions taken by the President were "an expectable part of the continued waging of the Vietnamese war," assuming the facts as asserted by the President in his May 8th address were true. If so, no further Congressional authorization would have been necessary. Thus the court was of the belief that judicial review of the President's order was proper but that inquiry into whether or not the facts as found by the President were based upon errors of judgment or lacked the support of adequate evidence, was impermissible. In our view, even the district court's limited inquiry was improper. As a general rule, we see no reason why Executive fact-finding must be totally insulated from judicial review. We have always demanded that there be, at the very least, some reasonable or rational basis for a finding of fact, whether made by an administrative agency, the Congress, or the Executive.[14] There are occasions, however, as the district court sensed, when judicial review of the Executive fact-finding process on even this limited basis is inappropriate. The proper response in such situations is not to "assume" the truth of the facts, but candidly to recognize that the court is incapable of assessing the facts and that the issue presented is therefore non-justiciable. Such a course has the advantage of avoiding the appearance that courts act as rubber-stamps for policies developed by a coordinate branch of government which fall without the realm of judicial consideration.

The difficulty we face in attempting to decide this case is compounded by a lack of discoverable and manageable judicial standards. Judge Dooling believed that the case could be resolved by simply inquiring whether the actions taken by the President were a foreseeable part of the continued prosecution of the war. That test, it seems to us, is superficially appealing but overly simplistic. Judges, deficient in military knowledge, lacking vital information upon which to assess the nature of battlefield decisions, and sitting thousands of miles from the field of action, cannot reasonably or appropriately determine whether a specific military operation constitutes an "escalation" of the war or is merely a new tactical approach within a continuing strategic plan. What if, for example, the war "de-escalates" so that it is waged as it was prior to the mining of North Vietnam's harbors, and then "escalates" again? Are the courts required to oversee the conduct of the war on a daily basis, away from the scene of action? In this instance, it was the President's view that the mining of North Vietnam's harbors was necessary to preserve the lives of American soliders in South Vietnam and to bring the war to a close. History will tell whether or not that assessment was correct, but without the benefit of such extended hindsight we are powerless to know.

14. Even when Congressional findings concerning as serious a matter as the scope of Communist Party activities in America came before the Court in Communist Party v. Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961)—after "extensive investigation by Committees of Congress over more than a decade and a half", *Id.* at 94, 81 S.Ct. at 1409—Mr. Justice Frankfurter's majority opinion indicated that these findings, while entitled to great respect, were not entirely immune from review. In that case, the findings were accepted because "[w]e certainly cannot dismiss them as unfounded or irrational imaginings." *Id.* at 95, 81 S.Ct. at 1410. There, of course, the record of public hearings and Congressional proceedings from which the Congress had drawn in making specific legislative findings of fact were matters of public record. Nothing of a comparable nature, in the way of fact-finding proceedings, is presented in the instant case.

When we said in DaCosta v. Laird, *supra*, that "[i]f the Executive were now escalating the prolonged struggle instead of decreasing it, additional supporting action by the Legislative Branch over what is presently afforded, might well be required," we implied, of course, that litigants raising such a claim had a responsibility to present to the court a manageable standard which would allow for proper judicial resolution of the issue. No such standards have been forthcoming from the appellant in this case. In so stating, however, we specifically do not pass on the point urged by appellant whether a radical change in the character of war operations—as by an intentional policy of indiscriminate bombing of civilians without any military objective—might be sufficiently measurable judicially to warrant a court's consideration, i.e., might contain a standard which we seek in this record and do not find. Appellant does suggest that a blockade such as the one imposed by the President is an "unambiguous" act of war under the canons of international law. We fail to understand what this argument proves. None would deny that the United States, like its North Vietnamese enemy, has engaged in acts of war in Indochina. Yet it is the thrust of this Court's decisions in *Orlando* and *DaCosta I*, that the war in Vietnam is a constitutional war. Thus appellant's argument that a blockade is an act of war takes us no further than to state the obvious fact that the Nation is at war: it says nothing of any moment about escalation, or whether one course of conduct is "expectable" within the framework of the war as previously prosecuted.

■ Appellant invokes the so-called "Mansfield Amendment", P.L. 92–156, 85 Stat. 423, Section 601(a) which provides:

Sec. 601. (a) It is hereby declared to be the policy of the United States to terminate at the earliest practicable date all military operations of the United States in Indochina, and to provide for the prompt and orderly withdrawal of all United States military forces at a date certain, subject to the release of all American prisoners of war held by the Government of North Vietnam and forces allied with such Government and an accounting for all Americans missing in action who have been held by or known to such Government or such forces. The Congress hereby urges and requests the President to implement the above-expressed policy by initiating immediately the following actions:

(1) Establishing a final date for the withdrawal from Indochina of all military forces of the United States contingent upon the release of all American prisoners of war held by the Government of North Vietnam and forces allied with such Government and an accounting for all Americans missing in action who have been held by or known to such Government or such forces.

(2) Negotiate with the Government of North Vietnam for an immediate cease-fire by all parties to the hostilities in Indochina.

(3) Negotiate with the Government of North Vietnam for an agreement which would provide for a series of phased and rapid withdrawals of United States military forces from Indochina in exchange for a corresponding series of phased releases of American prisoners of war, and for the release of any remaining American prisoners of war concurrently with the withdrawal of all remaining military forces of the United States by not later than the date established by the President pursuant to paragraph (1) hereof or by such earlier date as may be agreed upon by the negotiating parties.

Judge Dooling held that the first sentence of Sec. 601 was binding on the President, but that the second sentence and sections (1), (2) and (3) were

merely precatory. Although we neither address nor decide the question, we note that weighty constitutional considerations which support the President in his duties as Commander-in-Chief preclude too hasty an adoption of the view taken by the district court. Furthermore, it is arguable whether the legislative history of the Mansfield Amendment supports the position of the district judge.[15] In any event, even assuming, *arguendo*, that the first sentence of Sec. 601 is binding national policy, we see nothing in the language of the amendment which in any way prohibits the President's action challenged here. We have no way of knowing whether the military operations in question further or hinder the goals expressed in the Mansfield Amendment, or whether they have any bearing on those goals at all.

Thus it is our judgment that this Court is without power to resolve the issue narrowly presented in this case. Having previously determined, in accordance with our duty, that the Vietnamese war has been constitutionally authorized by the mutual participation of Congress and the President, we must recognize that those two coordinate branches of government—the Executive by military action and the Congress, by not cutting off the appropriations that are the wherewithal for such action—have taken a position that is not within our power, even if it were our wish, to alter by judicial decree.

Remanded with instructions that the complaint be dismissed.[16]

---

15. Debate in the Congress over an earlier version of the Mansfield Amendment, which contained provision for withdrawal of American troops within six months, and indicated that the proposed bill would express the "policy of the United States" reveals:

"Mr. McClellan: Mr. President, I would like to address two questions, at least, to the distinguished majority leader, the author of the amendment. I ask the distinguished Senator if subsection (a) of section 606 [sic]) is mandatory on the President, or does it, in a way, express a hope for a national policy? Sometimes we cannot carry out national policies. Sometimes they cannot be achieved. So I take it, it expresses a hope and is not mandatory; that it is not a law such as would be compelling.

Mr. Mansfield. That is correct. The amendment does not have the force of law. It is a little stronger than a sense of Congress resolution; it declares it to be the policy of the Congress and the executive branch, the Government of the United States, and in that sense, it is a very strong expression of hope, but it certainly does not tie the President's hands."

117 Cong.Rec., September 30, 1971 S. 15569

16. In view of our decision today, we need not consider whether Congressional action subsequent to the President's order, announced on May 8, 1972, by appropriating funds for the Armed Forces for fiscal year 1973, provided the necessary "authorization" of the military operations involved in this case.