Rabbi Ephraim GREENBERG and Mark J. Siedenberg, both individually and as class representatives, Plaintiffs,

v.

George W. BUSH, individually and as President of the United States, Richard B. Cheney, individually and as Vice–President of the United States, Colin L. Powell, individually and as Secretary of State of the United States, and the United States Department of State, Defendants.

No. 00–CV–5821 (NGG).

United States District Court, E.D. New York.

July 5, 2001.

E. David Smith, New York City, for Plaintiffs.

Alan Vinegrad, United States Attorney, Eastern District of New York, Philip J. Miller, Assistant U.S. Attorney, Brooklyn, NY, for Defendants.

*MEMORANDUM & ORDER*

GARAUFIS, District Judge.

Now before this court is Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs allege that the Executive Branch of the U.S. Government failed to abide by House Joint Resolution 322 of the 67th Congress of the United States ("HJR 322"), and seek relief pursuant to the Declaratory Judgment Act and the Mandamus Act. Plaintiffs seek a temporary restraining order, preliminary and permanent injunctions and declaratory relief. Defendants argue for dismissal of the complaint on the following grounds: (1) Plaintiffs' claim presents a nonjusticiable political question; (2) HJR 322 did not create a private right of action; and (3) Plaintiffs lack standing under Article III of the Constitution to bring this action. For the reasons set forth below, Defendants' motion is granted.

## I. Factual Background and Procedural History

HJR 322, adopted in 1922, states in its entirety as follows:

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the United States of America favors the establishment in Palestine of a national home for the Jewish people, it being clearly understood that nothing shall be done which may prejudice the civil and religious rights of Christian and all other non-Jewish communities in Palestine, and that the holy places and religious buildings and sites in Palestine shall be adequately protected. H.R.J. Res. 322, 67th Cong., 2d Sess., Ch. 372 (1922).

On November 2, 2000, Plaintiffs moved by order to show cause for a temporary restraining order pursuant to Rule 65. That motion was denied. (Nov. 2, 2000 Tr.

at 27–31.) Plaintiffs maintain that Defendants have supported and continue to support "the enemies of the Jewish inhabitants of Palestine, including such terrorist organizations as the Palestine Liberation Organization . . . and encourage the establishment of a state in Palestine . . . in violation of HJR 322." (Pls.' Resp. to Mot. to Dismiss at 1.) Additionally, Plaintiffs contend that the Executive Branch of the U.S. Government, acting in excess of its constitutional powers and in violation of HJR 322, has taken steps to "weaken and paralyze" Israel's inhabitants. (*Id.*) Defendants' actions are alleged to pose a continuing threat of immediate physical danger to the Plaintiffs. (*Id.*)

## II. Discussion

HJR 322 declares a general policy supporting the creation of a homeland for the Jewish people. The measure does not give rise to any judicially enforceable rights. Although the unavailability of a private right of action under HJR 322 is alone sufficient to grant Defendants' motion to dismiss, further bases for dismissal are discussed below.

### A. Private Right of Action

■ Congress did not create a private right of action under HJR 322. Traditionally courts look first to the face of a legislative enactment to determine whether or not a private right of action exists. On its face, HJR 322 includes no language indicating that any party, public or private, may bring suit thereunder. Absent such explicit language, courts may nevertheless infer a private right of action if clearly intended by Congress. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (acknowl-

edging that courts may infer private rights of action where appropriate).

■ In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court established a four-factor analysis for determining whether or not Congress intended to make available a private right of action. Those factors are: (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny such a remedy; (3) whether the private right of action would be consistent with or frustrate the purposes of the legislative scheme; and (4) whether the cause of action is traditionally relegated to state law in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law. *See Cort*, 422 U.S. at 78, 95 S.Ct. 2080. In private right of action cases decided after *Cort v. Ash*, the Supreme Court has stressed the centrality of legislative intent. The first, third and fourth *Cort* factors are thus viewed as mere proxies for the second. *See, e.g., Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *McClellan v. Cablevision of Conn., Inc.*, 149 F.3d 161, 164 (2d Cir.1998); *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 77 (2d Cir.1992).

■ The legislative history of HJR 322 gives no indication of any intent on the part of Congress to provide a private right of action. The report issued by the Committee on Foreign Affairs in connection with HJR 322 makes clear that the purpose of the resolution was to articulate a general policy favoring the creation of a Jewish state.[1] "This report expresses our

---

1. Putting aside the question of whether or not HJR 322 is in any sense actionable, it is at

least arguable that the joint resolution at issue expired, by its own terms, upon the creation

*moral interest* and our *favorable attitude* toward the establishment in Palestine of a national home for the Jewish people .... The realization of this hope should be given the *moral encouragement* of the American people speaking through their Representatives in Congress." H.R.Rep. No. 1038, at 1–3 (1922) (emphasis added). Nothing more is even hinted at in the Committee Report, which declares that HJR 322 "commits us to no foreign obligation or entanglement." *Id.* at 1. This unambiguous curtailment of the scope of HJR 322 is conclusive: "[u]nless congressional intent is clearly stated or can reasonably be inferred, 'the *essential predicate* for implication of a private remedy simply *does not exist.*'" *Wedlake v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 77 (2d Cir.1992) (emphasis added) (*citing Karahalios v. Nat. Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 533, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989)). Because Congress' intent is unambiguous, this court need not consider the three remaining *Cort* factors. *See Merrill Lynch, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 388, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (quoting *Cal. v. Sierra Club*, 451 U.S. 287, 302, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). In an excess of caution, however, I touch briefly on each in the following paragraphs.

The first *Cort* factor asks whether Plaintiffs are members of the class for whose benefit the statute was passed. A close reading of HJR 322 demonstrates that it was not passed for the benefit of any specific class of persons. Rather, its moral encouragement was directed at a certain ideal, namely, the creation of a Jewish state. Whether such a goal could reasonably be said to establish and encompass a distinct class of intended beneficiaries is doubtful, not least of all because when Congress passed HJR 322, the vision of an independent Jewish homeland was widely shared. *See* H.R.Rep. No. 1038, at 1–3. But that is an historical, rather than a judicial, inquiry. The adjudication of this case cannot, in any event, be said to turn on its outcome, since Congress gave no indication that HJR 322 was intended to protect anyone.

The third *Cort* factor, whether a private right of action would be consistent with the legislative scheme, further demonstrates the futility of trying to infer a private right of action here. HJR 322 does not set forth a legislative scheme; it is a statement of policy, and nothing more. There is thus no legislative scheme to which a private right of action could conform.

The final *Cort* factor, consideration of the relevance of state law, is not instructive in the analysis of HJR 322 because the states' role in conducting foreign policy is minimized under the Federal Constitution. Consideration of all of the *Cort* factors, therefore, necessitates my conclusion that Congress did not intend to include a private right of action under HJR 322. Accordingly, there is no basis for Plaintiffs' suit.[2]

of the state of Israel, some 26 years after the enactment of HJR 322.

**2.** Plaintiffs cite *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), as standing for the proposition that a party may have standing and a private right of action under a federal statute even when Congress did not expressly create a private right of action in the statute: "[T]he Supreme Court held that individuals who benefitted from the national game refuge created by a special Act of Congress, and who were injured when the Forest Service and Department of the Interior used the land for incompatible purposes ... would have standing and a right of action under the federal statutes even though those statutes did not specifically 'create' a private right of action." (Pls.' Resp. to Mot. to Dismiss at 10.) Plaintiffs misread *Sierra Club* In that case, the Court examined

## B. Political Question

■ In order to grant the relief sought in this case, this court would be required to redirect the course of foreign policy by instructing the President, Vice President, Secretary of State, and the Department of State how to conduct foreign relations touching upon the state of Israel. Separation of powers concerns counsel against the courts attempting to give such instruction. Where, as here, relief cannot be granted except by undermining the constitutionally-based separation of powers, prudential considerations necessitate eschewing adjudication on the grounds that such cases are nonjusticiable.

■ The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Supreme Court has consistently adhered to the policy articulated in *Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918), that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." As the Supreme Court stated in *Chicago & Southern Air Lines v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948):

> The very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Id.*

The *Baker* Court set out to reign in the many "analytical threads that make up the political question doctrine" by laying out six criteria for determining whether a political question is a prominent aspect of a case and thus nonjusticiable:

> [1][A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from the multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. 691.

■ Plaintiffs misunderstand the first *Baker* factor. In determining whether or not this case is justiciable, I am bound only to consider whether the issue in question is one whose resolution is best left to the political branches of govern-

standing under the private right of action created in the Administrative Procedure Act, 5 U.S.C. § 702, which allows persons suffering legal wrong as a result of agency action to seek judicial review and concluded that the Sierra Club lacked standing to sue. *Sierra Club,* 405 U.S. at 740, 92 S.Ct. 1361.

ment. *See Baker*, 369 U.S. at 226, 82 S.Ct. 691; *Lamont v. Woods*, 948 F.2d 825 (2d Cir.1991). This Court need not determine the relative power of the Executive and Legislative branches to conduct foreign policy. "The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse." *Goldwater v. Carter*, 444 U.S. 996, 997, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); *see also Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 210–11 (D.C.Cir.1985) (Ginsburg, J., concurring) (dismissing claims by congressional plaintiffs against President Reagan for violation of "war powers clause" as not ripe for judicial review). It is nevertheless plain that "[t]he conduct of foreign relations is committed largely to the Executive Branch, with power in the Legislative Branch, to, *inter alia*, ratify treaties with foreign sovereigns" *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 163 (2d Cir.2001); *see also Dep't of the Navy v. Egan*, 484 U.S. 518, 529–30, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). This conclusion is entirely consistent, of course, with a long line of cases recognizing the constitutional authority of the President and Congress to conduct foreign relations. And although the Supreme Court has counseled a modest approach to the withholding of judicial scrutiny, *see Baker*, 369 U.S. at 211, 82 S.Ct. 691, it is difficult to imagine a less likely subject for judicial decision-making than the propriety *vel non* of a broad legislative pronouncement favoring a particular foreign policy outcome.

■ Even assuming, *arguendo*, that separation of powers presented no obstacle to the participation of the federal judiciary in formulating foreign policy, adjudication of this case would nevertheless be impracticable because of the impossibility of developing judicially discoverable and manageable standards for resolving the controversy. As already stated, HJR 322 articulates no legally enforceable obligation or prohibition. This court would thus be required to decide whether the actions of a coordinate branch of government conform to a resolution that speaks only in the broadest precatory terms. And even if the resolution were held to impose some affirmative obligation or restriction upon the Executive Branch, this court would encounter nearly insuperable difficulties assessing whether its actions were in conformity with the goals of the resolution. In *Greenham Women Against Cruise Missiles .v. Reagan*, 591 F.Supp. 1332 (S.D.N.Y.1984), *aff'd*, 755 F.2d 34 (2d Cir.1985), the court held that determination of the effect of missile deployment on world peace was beyond the competence of the judiciary. It is likewise beyond the expertise and abilities of the judiciary to determine whether or not the Executive branch's support of negotiations between the Palestinian National Authority and the State of Israel are in line with, or contradict, Congressional support for a Jewish homeland.

■ In *DaCosta v. Laird*, 471 F.2d 1146 (2d Cir.1973), the court held that a Constitutional challenge of President Nixon's order to mine the ports of North Vietnam was nonjusticiable. The court placed great weight on the argument that adjudication is necessarily impossible in the absence of discoverable and manageable judicial standards. *Id.* at 1153. As here, moreover, the *DaCosta* court was presented with legislation alleged to have binding effect on the Executive Branch. The so-called "Mansfield Amendment," P.L. 92–156, 85 Stat. 423, § 601(a), stated "[i]t is hereby declared to be the policy of the United States to terminate at the earliest practicable date all military operations of the United States in Indochina," and set

out further conditions and requirements for the President. The Second Circuit, questioning whether the President was bound by the legislation,[3] stated:

> [E]ven assuming, *arguendo*, that the first sentence of Sec. 601 is binding national policy, we see nothing in the language of the amendment which in any way prohibits the President's action challenged here. We have no way of knowing whether the military operations in question further or hinder the goals expressed in the Mansfield Amendment, or whether they have any bearing on those goals at all.

*Id.* at 1157. This court likewise lacks any meaningful standard for determining whether Defendants' actions promote the goals of HJR 322. To formulate and apply such a standard would amount to second-guessing the political branches—precisely the sort of encroachment upon the role of a coordinate branch of government abjured by the political question doctrine.[4]

## C. Standing

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 184 (2d Cir.2001) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Article III limits the power of federal courts to hear actual cases or controversies, which are defined by injury in fact, causation and redressability. *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Warth*, 422 U.S. at 501, 95 S.Ct. 2197.

Defendants concede, *arguendo*, that at least one named Plaintiff of the putative class has suffered injury in fact. This court agrees, however, that causation and redressability are insurmountable hurdles

---

**3.** The court cited an exchange in Congress between Sen. McClellan and Sen. Mansfield where Sen. Mansfield is quoted as saying "The amendment does not have the force of law. It is a little stronger than a sense of Congress resolution; it declares it to be the policy of the Congress and the executive branch ... it is a very strong expression of hope, but it certainly does not tie the President's hands." *DaCosta* 471 F.2d at 1157 (citing 117 Cong. Rec., Sept. 30, 1971 § 15569). This is very similar to the language and sentiment cited above from the legislate history of HJR 322.

**4.** Looking back to President Carter's negotiation of the Camp David Accord, the Executive Branch of the United States has undertaken to negotiate treaties and develop relationships between Israel and its Arab neighbors. *See e.g.*, Certification on Jordan October 21, 1985 Pres. Cert. No. 86–01, 50 FR45387, 1985 WL 107160 (Pres.). The political branches of government have endeavored to ease the tensions of the Middle East through economic aid and other measures. Middle East Peace Facilitation Act of 1993, Pub.L. No. 103–125, § 1487 (1993). These negotiations have included the bringing together of Palestinian and Israeli leaders in an effort to create a lasting peace. Alison Mitchell, *U.S. Tries to Salvage Mideast Role* Int'l Herald Trib., August 2, 1997, at 5. Nothing could be more obviously inappropriate than involving the federal judiciary in directing the course of Israeli–Palestinian relations. It is wholly inappropriate for the judicial branch to question "a political decision already made." *Baker* 369 U.S. at 217, 82 S.Ct. 691. Moreover, to adjudicate this foreign policy matter would likely result in embarrassment due to "multifarious pronouncements by various departments on one question." *Id.* The President is entrusted with the role of speaking for the United States abroad, *see, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), and this court will not interfere with his negotiations on such a sensitive matter as the creation of peace in the Middle East.

for these Plaintiffs to overcome. Though Plaintiffs assert both that the injury for which they seek redress is one directly caused by Defendants' actions and that the injurious actions of a third party (the Palestinians) would not have occurred absent Defendants' unlawful conduct, neither argument satisfies traditional standing requirements.

The necessary causal connection between the injury and the conduct complained of has been defined in the following manner: "the injury has to be fairly ... traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation omitted) (citing *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). It would be difficult to imagine a clearer example of a third party's actions breaking the causal chain. The gunshots and other violence complained of are fairly traceable to neither Defendants' foreign policy decisions nor actions taken in accordance with those decisions. Furthermore, Plaintiffs must satisfy the burden of alleging facts from which it could be reasonably inferred that, absent Defendants' unlawful acts, there is a substantial probability that Plaintiffs would not have been shot at by a third party. *See Warth,* 422 U.S. at 504, 95 S.Ct. 2197. Plaintiffs must also show that if the court affords the relief requested, the asserted violent actions directed at the Plaintiffs will cease. *Id.* The court finds that such inferences could not reasonably be made. Plaintiffs have suffered no greater harm and seek "relief that no more directly and tangibly benefits" them than the public at large. *Lujan,* 504 U.S. at 574, 112 S.Ct. 2130. Plaintiffs' com-

plaint fails to state an Article III case or controversy.

Because Plaintiffs have not satisfied the threshold Article III standing requirements, the court need not analyze prudential standing considerations.

### D. Equitable relief

██ Equitable relief is inappropriate, notwithstanding this court's dismissal of Plaintiffs' complaint for the reasons set forth *supra.* Useful guidance can be found in the analogous case of *Sanchez–Espinoza v. Reagan,* 770 F.2d 202 (D.C.Cir.1985), in which the D.C. Circuit withheld nonmonetary relief, deciding that it would be an abuse of discretion to provide discretionary relief when to do so would mean an interjection into sensitive foreign affairs matters. Similar caution must be exercised in the present case; I conclude that it would not be in keeping with the traditional justifications for granting equitable relief to interfere with the Executive Branch's conduct of foreign relations by exercising discretionary relief.

### III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED in its entirety.

It is SO ORDERED.