GREENHAM WOMEN AGAINST CRUISE MISSILES, an unincorporated association; Rebecca Johnson; Christine King, on behalf of herself and her minor child Bethan King; Jean Hutchinson; Susan Lamb, on behalf of herself and her minor children Jodie Lamb and Angharad Lamb; Carole Harwood, on behalf of herself and her minor child Albert Harwood; Deborah Law; Lynne Fortt, on behalf of herself and her minor children Aaron Fortt and Ryan Fortt; Nell Logan; Angela Phillips, on behalf of herself and her minor children Clara Phillips and Jacob Phillips; Elizabeth Forder, on behalf of herself and her minor children Daniel Forder and Joseph Forder; Carrie Pester; Susan Bolton, on behalf of herself and her minor children Adam Pereira, Sophie Pereira, Jacob Pereira and Luke Bolton; Simone Wilkinson, on behalf of herself and her minor children James Wilkinson and Victoria Wilkinson; Congressman Ronald Dellums and Congressman Ted Weiss, Plaintiffs,

v.

Ronald Wilson REAGAN, President of the United States; Caspar Weinberger, Secretary of Defense; Vern Orr, Secretary of the Air Force; and John O. Marsh, Secretary of the Army, sued in their official capacities, Defendants.

No. 83 Civ. 8154 (DNE).

United States District Court, S.D. New York.

July 31, 1984.

Christine King, pro se.

Carrie Pester, pro se.

Anne E. Simon, Sarah Wunsch, Ellen Yaroshefsky, Jane Hickman, Fisher, Meredith & Partners, London, England, Eleanor Jackson Piel, New York City, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Carolyn L. Simpson, and Dennison Young, Jr., Asst. U.S. Attys., New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

EDELSTEIN, District Judge:

Plaintiffs in this action fall into three distinct categories: British women who live within a 100 mile radius of the United States Air Force Base in Greenham Common, Great Britain, suing on their own behalf and on behalf of their minor children, and an association of these women ("Greenham plaintiffs"); a United States citizen living in London, Deborah Law; and two United States Congressmen, Ronald Dellums of California and Ted Weiss of New York ("congressional plaintiffs"). Plaintiffs seek to enjoin the deployment of ninety-six Ground Launched Cruise Missiles ("cruise missiles") at the United States Air Force Base in Greenham Common, which is located approximately 60 miles west of London. They contend that the deployment of the cruise missiles will create a substantial risk of a nuclear war initiated by either the United States or the Soviet Union, or of a nuclear accident. From this premise, those plaintiffs living near Greenham Common allege that the deployment of these missiles constitutes tortious injury and violates rights granted by the fifth and ninth amendments to the United States Constitution. The congressional plaintiffs allege that deployment violates their constitutional right as members

of Congress to declare war and provide for the general defense and welfare.

The defendants have moved pursuant to Fed.R.Civ.P. 12(b) to dismiss the complaint for lack of subject matter jurisdiction [1] and for lack of standing.

## BACKGROUND

The decision to deploy cruise missiles at a United States Air Force Base in Greenham Common, Great Britain was the result of a planning meeting held in January, 1979 between the United States President, the British Prime Minister, the French President and the West German Chancellor. It is part of a broader plan to modernize the nuclear forces of the North Atlantic Treaty Organization ("NATO") and to provide a more adequate defense for Western Europe.[2] The deployment decision was jointly made by President Jimmy Carter and our NATO allies in December, 1979. *See* N.Y. Times, Dec. 13, 1979, at A1, col. 6. Congress over the years has appropriated funds for this plan.[3]

The Cruise Missile is a jet aircraft that navigates itself without a pilot or human assistance. This pilotless jet checks its radar signals against a map of the terrain stowed in an onboard computer. These small, solid-fueled, pilotless missiles are designed to travel at subsonic speeds at very low altitudes, and with a range of up to 1,500 miles. While they do not have an intercontinental range, they can be carried to the border of the Soviet Union by B–52s and launched from the air.

The plaintiffs allege that the cruise missile system, the product of a number of technological innovations in nuclear weapon design, has three significant advantages over other nuclear weapons.[4] The mobility of cruise missile launchers make it more difficult to destroy the missiles in an attack on their base. Plaintiffs Memorandum in Support of Motion for a Temporary Restraining Order at 13 ("Plaintiffs' TRO Memo"). Once launched, cruise missiles are difficult to detect in flight, in part bacause the missiles can delay radar detection by flying at low altitudes for extended periods of time. Complaint, ¶ 34; Plaintiffs' TRO Memo at 14–15. Finally, cruise missiles achieve great accuracy as a result of a sophisticated guidance system. Complaint, ¶¶ 36, 41; Plaintiffs' TRO Memo at 15–16.

On November 9, 1983, plaintiffs filed this action to enjoin the deployment of ninety-six cruise missiles at Greenham Common.

---

1. Although the defendants ask the court to dismiss the complaint for lack of subject matter jurisdiction, their arguments are couched in terms of non-justiciability. As the Supreme Court pointed out in *Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691, 699, 7 L.Ed.2d 663 (1962), however, there is a significant difference between determining whether a federal court has jurisdiction over the subject matter and determining whether a cause over which a court has subject matter jurisdiction is justiciable. Since the gravamen of defendants' motion involves questions of justiciability, the court will analyze the instant motion in terms of whether this case presents a justiciable controversy.

2. This modernization plan also includes the deployment of Pershing II ballistic missiles in West Germany, to replace older Pershing IA missiles stationed there. The deployment of Pershing II missiles to West Germany commenced in November, 1983.

3. Funding for Research and Development was approved by Congress in 1978 Dept. of Defense ("DOD") Appropriation Act, Pub.Law 95–111, 91 Stat. 886 (Sept. 21, 1977); 1978 DOD Appropriation Authorization Act, Pub.Law 95–79, 91 Stat.

323 (July 30, 1977). Production funding was approved by Congress in 1979 DOD Appropriation Act, Pub.Law 95–457, 92 Stat. 1231 (Oct. 13, 1978) and 1979 DOD Appropriation Authorization Act, Pub.Law 95–485, 92 Stat. 1611 (Oct. 20, 1978). Funds for construction of support facilities at Greenham Common were allocated, *e.g.*, 1981 Military Construction ("Mil.Con.") Authorization Act, Pub.Law 96–418, 94 Stat. 1749 (Oct. 10, 1980), 1981 Mil.Con.Appropriation Act, Pub.Law 96–436, 94 Stat. 1863 (Oct. 13, 1980), 1984 Mil.Con.Authorization Act, Pub.Law 98–115, 97 Stat. 757 (Oct. 11, 1983) and 1984 Mil. Con.Appropriations Act, Pub.Law 98–116, 97 Stat. 795 (Oct. 11, 1983).

4. For the purpose of this motion to dismiss, the technology and capability of the cruise missile as alleged in plaintiffs' complaint and memorandum of law are taken as true. The court notes, however, that plaintiffs have failed to point out potential deficiencies of cruise missiles. For example, the missiles are vulnerable to an attack from above by the Soviet Foxhound Fighter with its look-down, shoot-down radar.

Plaintiffs assert that deployment of the cruise missiles will render nuclear war and accident likely, if not inevitable. Three explanations are offered in support of this contention. First, plaintiffs point to the longstanding United States' policy of "first use"—the willingness in the event any NATO member is attacked to use nuclear weapons if necessary to repel the attack.[5] Plaintiffs assert that the deployment of cruise missiles translate this willingness on the part of the United States to use nuclear weapons first into a capability to do so. Plaintiffs contend that this combination of willingness and capability makes it likely that the United States will in fact initiate a "limited" nuclear war. Second, plaintiffs opine that even if the United States does not initiate a nuclear exchange, this new capability for "first use" will likely provoke a preemptive nuclear strike against the missiles by the Soviet Union. Finally, plaintiffs contend that the possibility of an accidental thermonuclear detonation of a missile on the ground or of an accidental detonation of the high explosive component of the warhead increases the likelihood of nuclear disaster on British soil.

Based on these alleged consequences of deployment, the Greenham plaintiffs contend that the deployment of cruise missiles contravenes several customary norms of international law, subjecting them to tortious injury actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350. The Greenham plaintiffs join plaintiff Deborah Law, a United States citizen who lives in London, in alleging that deployment violates their rights guaranteed by the fifth and ninth amendments to the United States Constitution. Plaintiffs Ted Weiss and Ronald Dellums, who are United States Congressmen, allege that deployment violates their constitutional right and responsibility as members of Congress to declare war and provide for the general defense and welfare.

On November 9, 1983, this court heard argument and denied plaintiffs' application for a temporary restraining order prohibiting the movement to Greenham Common of any parts of the cruise missiles, finding that plaintiffs had failed to establish irreparable injury or likelihood of success on the merits. The court also questioned the urgency of the matter since, according to a newspaper article attached as exhibit A to plaintiffs' affidavit in support of the restraining order, the deployment was not to commence for another two weeks. The article proved inaccurate; the deployment of the cruise missiles commenced on November 14, 1983. The uncertainty of when the transportation of the cruise missiles to Greenham Common would take place having been resolved, the plaintiffs renewed their request for a temporary restraining order. On November 16, 1983, the court heard argument and denied plaintiffs' application on the grounds that plaintiffs had failed to show irreparable injury or likelihood of success on the merits.

The defendants have moved pursuant to Fed.R.Civ.P. 12(b) to dismiss the complaint, arguing that all plaintiffs' claims are nonjusticiable because the action raises political questions, the congressional plaintiffs' claim lacks ripeness, and all plaintiffs lack standing. The court heard oral argument on defendants' motion to dismiss on November 22, 1983. Extensive papers have been submitted by counsel for the court's consideration.[6] In addition several *amicus*

---

5. "First use" is to be distinguished from "first strike," which refers to "a preemptive disarming nuclear strike aimed at eliminating as completely as possible the entire strategic potential of the adversary." Karl Kaiser, Georg Lebar, Alois Mertes, Franz Josef Schulze, "Nuclear Weapons and the Preservation of Peace," 60 *Foreign Affairs* 1157, 1158 (Summer 1982). It is not in dispute that a first strike is not part of American or NATO policy.

6. In addition to its memorandum of law in support of the motion to dismiss dated November 15, 1983, defendants submitted a reply memorandum dated November 22, 1983 and a sur-reply memorandum dated December 7, 1983. Plaintiffs submitted a memorandum in opposition to defendants' motion dated November 19, 1983 and a sur-reply memorandum dated December 1, 1983. Recently plaintiffs wrote a letter to the court, dated January 25, 1984, advising the court of a recent federal court decision that, plaintiffs contend, addresses some of the issues raised by the instant motion. De-

*curiae* briefs were accepted.[7] By an endorsement dated July 3, 1984 the court granted defendants' motion to stay all discovery pending the determination of their motion to dismiss.

## DISCUSSION

This court is asked to decide whether the instant action presents a justiciable controversy. The Constitution extends the judicial power to those "cases" and "controversies" specifically enumerated in Article III; matters not within the category of "cases" or "controversies" cannot be entrusted to courts under Article III of the Constitution. Comprehended within the limitations imposed by these terms are constitutional and prudential concerns about the proper role of the courts in dispute resolution and the allocation of power among the three branches of our government. These concerns find definition in various doctrines of justiciability including that doctrine which restricts the judiciary from deciding political questions.

"Ever since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the federal courts have declined to judge some actions of the Executive and some interactions between the Executive and Legislative branches where it is deemed inappropriate that the judiciary intrude." *Holtzman v. Schlesinger*, 484 F.2d 1307, 1309 (2d Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). The most authoritative and commonly cited formulation of the political question doctrine is that of Justice Brennan in the seminal case of *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1961).

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

If one of these conditions is inextricable from the case at bar, then adjudication of the case may be said to require resolution of a political question, which is non-justiciable and hence not reviewable by a court. *Id.*

This case does not present a political question under the first of the six categories enumerated in *Baker* —the constitutional commitment of the issue presented to a political branch. Defendants contend that the question presented here involves "the President's exercise of the power to conduct the foreign relations of the United States." Defendants' Memorandum of Law, at 10. Since the President's foreign policy powers derive from his constitutional authority as Chief Executive and Commander-in-Chief of the armed forces, defendants opine that the issue before the court is committed by the Constitution to

---

fendants responded to this submission by letter dated January 31, 1984.

**7.** The court accepted an *amicus curiae* brief in support of the defendants' motion from United States Senators Jeremiah Denton, Steven Symms and Jesse Helms, United States Congressman Mickey Edwards, and the Washington Legal Foundation. The motion by Senators Paul Laxalt and Orrin Hatch to join as *amici* in that brief was granted. The court also accepted *amicus curiae* briefs in opposition to the motion to dismiss from the National Lawyers Guild and

from the following European corporations: Concertation Paix et Developement, Ecology Party, Scottish Campaign for Nuclear Disarmament, Women for Peace of Sweden, et al., Turkish Peace Association, et al., Den Internationale Liga For Fred OG Friehed, et al., Women's International League for Peace and Freedom (British Section), Women's Peace Alliance, Upper Austria Peace Movement, et al., Women for Peace in the Netherlands, Campaign for Nuclear Disarmament and INLAW, War on Want Compaigns Limited, and County Council of the County of Glamorgan.

the Executive and therefore is a non-justiciable political question.

Defendants misapprehend the issues to be adjudicated. Looking at the pleadings in the light most favorable to the plaintiffs, this court is not asked to determine the foreign policy of the United States. Plaintiffs do not ask this court to decide the wisdom, morality, or efficacy of the decision to deploy cruise missiles at Greenham Common. The responsibility for that decision lies with the Executive and Legislative branches of the government. Plaintiffs ask this court to determine the legality of the challenged action. In particular, they ask the court to adjudicate torts, to protect constitutional rights of citizens and of non-citizens under United States control, and to enforce the constitutional mandate of separation of powers. The Constitution commits the resolution of these issues to the courts, and not to a coordinate political department.[8]

Having decided that this action does not belong to the first *Baker* category, the court now considers whether there is a lack of judicially discoverable and manageable standards, the second category enumerated in *Baker*. In briefs and at argument, plaintiffs de-emphasize the significance of the second as well as the other remaining *Baker* categories. They argue that the first of the six *Baker* categories is the critical one because it involves the constitutional power of the court to decide certain issues, whereas the remaining five merely involve prudential considerations and call for discretionary judgments. Plaintiffs

further point out that in two decisions the Supreme Court, having determined that the issue presented was not textually committed to a political branch, dismissed the remaining *Baker* categories in "short order". Plaintiffs opine that this summary treatment of the last five categories indicates that they are secondary and less important than the first.[9] *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 23–28; Transcript of Argument on Nov. 22, 1983, at 40.

This argument flies in the face of a line of post-*Baker* precedent. In *DaCosta v. Laird*, 471 F.2d 1146 (2d Cir.1973), for example, the Second Circuit Court of Appeals found the lack of judicially discoverable and manageable standards sufficient grounds for dismissing a suit as a political question. There an inductee in the United States Army alleged the President's decision to mine harbors and bomb targets in North Vietnam constituted, in the absence of congressional authorization, an illegal escalation of the war. The Second Circuit held that this suit presented a non-justiciable political question, relying exclusively on its finding that the court is "incapable of assessing the facts" and "lack[s] discoverable and manageable standards" to resolve the issue. *Id.* at 1155. The court dismissed the action, noting that dismissal for lack of judicially discoverable and manageable standards is mandatory under *Baker*, not discretionary.

[W]e are at a loss to understand how a court may decide a question when there are no judicially discoverable or manage-

---

8. The remedy plaintiffs seek—an order enjoining the deployment of cruise missiles—would clearly impinge upon national security and foreign policy powers of the President, which are textually committed by the Constitution to the political branches of government. The remedy sought, however, is different from the issues to be adjudicated. Here the issues to be adjudicated emerge from allegations of torts and constitutional violations. These issues are committed to the courts for resolution and thus the case does not present a political question under the first of the *Baker* categories. Nevertheless, the nature of the remedy sought may still be relevant for determining whether the case presents a non-justiciable political question under another theory. *See infra* text.

9. The two Supreme Court decisions plaintiffs cite are *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) and *I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In both cases the Court held that neither case presented a political question after carefully considering *all* six *Baker* categories. *See* 395 U.S. at 548–49, 89 S.Ct. at 1978; 103 S.Ct. at 2779–80. In neither opinion did the Court rank the importance of the *Baker* categories or hint that the first category was more significant than the others. Any interpretation of these cases to the contrary is erroneous and without merit.

able standards for resolving it.... [W]here all agree that standards are presently unavailable, the court has no alternative but to dismiss for lack of jurisdiction. This conclusion is not reached by the exercise of discretion, but rather of necessity.

*Id.* at 1153–54.

Similarly, in *Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974), plaintiffs challenged bombing and other military activity in Cambodia. The Second Circuit reversed the decision of the district court granting summary judgment for plaintiffs and directed the district court to dismiss the complaint, holding that it presented a non-justiciable political question. The Court of Appeals particularly objected to the lower court's finding that the bombing of Cambodia, after the removal of American forces and prisoners of war from Vietnam, represented "a basic change in the situation, which must be considered in determining the duration of prior Congressional authorization" and that such action constituted a tactical decision not traditionally confided to the President. *Id.* at 1310. Relying on its earlier *DaCosta* decision, the court stated that "[t]hese are precisely the questions of fact involving military and diplomatic expertise not vested in the judiciary, which make the issue political and thus beyond the competence of [the lower] court or this court to determine." *Id.*

More recently, the Court of Appeals for the District of Columbia found the second *Baker* category to be controlling in *Crockett v. Reagan,* 720 F.2d 1355 (D.C.Cir.1983) (per curiam). A group of congressmen, including instant plaintiffs Dellums and Weiss, asked a federal court to rule, *inter alia,* that United States aid, military equipment and advisors had been introduced into situations in El Salvador in which "imminent involvement in hostilities" was clearly indicated and, hence, the President's failure to report such facts to the Congress violated the War Powers Resolution and the war powers clause of the Constitution. The district court dismissed the action on the ground that the war powers issue presented a non-justiciable political question. *Crockett v. Reagan,* 558 F.Supp. 893, 898 (D.D.C.1982). The lower court found that it lacked the resources and expertise to resolve the particular factual disputes involved and that such determinations "are appropriate for congressional, not judicial, investigation and determination." *Id.* On appeal, the United States Court of Appeals ruled that it could find no error in the district court's judgment and affirmed "for the reasons stated by the District Court." 720 F.2d at 1357.

In the instant case, the plaintiffs ask this court to make determinations that are further beyond judicial resources and expertise than those faced by the *DaCosta, Holtzman* and *Crockett* courts. A review of plaintiffs' pleadings and exhibits reveals that if the merits were reached, the court would have to determine whether the United States by deploying cruise missiles is acting aggressively rather than defensively, increasing significantly the risk of incalculable death and destruction rather than decreasing such risk, and making war rather than promoting peace and stability.[10]

---

10. Plaintiffs assert against the defendants three general claims that would require the court to make factual determinations that it is simply incapable of making. First plaintiffs contend that the deployment of cruise missiles contravenes five customary norms of international law—the prohibition under the United Nations Charter of the threat or use of force, the right to survival, crimes against peace, laws of war, and the crime of genocide—thereby subjecting the plaintiffs to tortious injury. Assuming *arguendo* that these principles are part of the federal common law, to find a violation of one or more, the court would have to determine that deployment of cruise missiles is an act of aggression and that it will render nuclear war likely. Second, plaintiffs assert that the planned deployment violates their rights to life and liberty under the fifth and ninth amendments to the Constitution. This, too, requires a finding that deployment will inevitably lead to death and destruction. The third and final claim is that the deployment violates Congress's constitutional rights to declare war. To find that deployment violates the separation of powers, the court would have to find that deployment is tantamount to a declaration of war by the President now or an inevitable declaration of war by the President in the foreseeable future.

The courts are simply incapable of determining the effect of the missile deployment on world peace. Plaintiffs ask this court to find that since the cruise missiles can be used in a "first use" situation, the risk that the United States will in fact initiate a limited nuclear war increases terribly; and that even if the United States does not initiate a nuclear exchange, this new capability for "first use" will likely provoke a preemptive nuclear strike by the Soviet Union. In contrast, the government takes the position that the deployment of cruise missiles promotes peace by providing a more adequate and needed defense for Western Europe thereby deterring the Soviet Union from initiating war and by motivating the Soviet Union to negotiate arms reduction seriously. "History will tell [which] assessment [is] correct, but without the benefit of such extended hindsight [the courts] are powerless to know." *DaCosta v. Laird, supra,* 471 F.2d at 1155.

Undoubtedly it can be said that the President and Congress cannot "know" with an absolute degree of certainty the effects of missile deployment. But it is precisely because the ultimate effects are not altogether knowable that conjecture and predictions about them are best left to the political branches of government. Questions that are infinitely more complicated than those posed by the question "how many angels can dance on the head of a pin?" are not ready for ready answers. Questions like how to ensure peace, how to promote prosperity, what is a fair utilization and distribution of economic resources are examples of questions that must be decided by the fair, sound, seasoned and mature judgments of men and women responsive to the common good. The power to make these determinations is therefore appropriately allocated to the political branches.

Furthermore, courts are just not on an equal footing with the political branches to determine the likely consequences of missile deployment. The information pertinent to such determinations would prove unmanageable for the court. White House, Department of State, Department of Defense, Central Intelligence Agency, and congressional sources, not to mention a number of foreign governments, would all possess information relevant to this court's inquiry. Much of this information would, of necessity, be privileged, while other information would be difficult to ascertain or wholly unavailable to a court. As the court in *Holtzman* aptly noted, "[the court is] not privy to the information supplied to the Executive by his professional military and diplomatic advisors and even if [it] were, [the court is] hardly competent to evaluate it." *Holtzman v. Schlesinger, supra,* 484 F.2d at 1310.

The court concludes that the factfinding that would be necessary for a substantive decision is unmanageable and beyond the competence and expertise of the judiciary. This action therefore clearly belongs to the second category enumerated in *Baker.*

The lack of judicially discoverable and manageable standards is not the only reason this case is non-justiciable. The nature of the relief plaintiffs seek directly impinges upon the foreign policy of the United States. Plaintiffs ask the court to enjoin the deployment of cruise missiles at Greenham Common. This relief, if granted, would directly alter the military and foreign policy of the United States with its NATO allies and military and diplomatic relations with the Soviet Union. The particular delicacy of foreign affairs weighs against intervention by the court. As the Supreme Court stated in the now oft-quoted passage from *Chicago & Southern Airlines v. Waterman Steamship Co.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948):

[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsi-

bility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*See also United States v. First National City Bank,* 396 F.2d 897, 901 (2d Cir.1968) ("The courts must take care not to impinge upon the prerogatives and responsibilities of the political branches of the government in the extremely sensitive and delicate area of foreign policy.").

Although not "every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962), this case surely does. Our relations with foreign countries would be seriously disrupted if the federal courts exercised supervision and control over such critical elements of our foreign policy as the deployment of cruise missiles. It is difficult to imagine how the United States could influence the policies of foreign governments through diplomatic means if the actions of the political branches could be subject to public review and rejection by United States courts.

Moreover, the relief plaintiffs request could lead to "consequences in our foreign relations completely beyond the ken and authority of this Court to evaluate." *Atlee v. Laird,* 347 F.Supp. 689, 705 (E.D.Pa. 1972), *aff'd mem.,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). The deployment decision involved an extremely subtle balancing process which took into account a complex of factors of national and international character. The process by which such a decision is reached must be flexible and depends upon the proper functioning of the political system. Only the Executive and Legislative branches have the facility for making such policy decisions and for predicting their beneficial or detrimental effects on the international posture of the United States and its allies.

For instance, enjoining cruise missile deployment could engender serious discord among our allies and unravel the carefully balanced deployment scheme. It could encourage the USSR to intensify its pressure for unilateral Western concessions which would seriously erode NATO's ability to deter Moscow's growing nuclear threat or discourage Soviet willingness to reach an arms control agreement.[11] Whether any or all of these potentialities might be realized cannot be predicted which, of course, supports the finding that the case is non-justiciable.

This is not the first time that the courts have been asked to enjoin the Executive or Legislature from carrying out a nuclear weapons program. In *Pauling v. McNamara,* 331 F.2d 796 (D.C.Cir.1963), *cert. denied,* 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964), a case substantially similar in fact and principle to the one at bar, an action was brought on behalf of 115 United States citizens and more than 100 aliens, including eight Nobel Laureates. The plaintiffs in *Pauling* sought to enjoin the government from detonating nuclear weapons for purposes of testing, alleging that such nuclear testing caused plaintiffs to be damaged genetically, somatically, and psychologically. The action was dismissed because "decisions in the large matters of basic national policy, as of foreign policy, present no judicially cognizable issues and hence the courts are not empowered to decide them." *Id.* at 798.

The language of then Circuit Judge Warren E. Burger is very much in point here:

That appellants now resort to the courts on a vague and disoriented theory that judicial power can supply a quick and pervasive remedy for one of mankind's great problems is no reason why we as judges should regard ourselves as some kind of Guardian Elders ordained to review the political judgments of elected representatives of the people. In framing policies relating to the great issues of national defense and security, the people are and must be, in a sense, at the mercy

---

11. The relief plaintiffs request would grant to the Soviet Union one of its objectives—preventing deployment of medium-range missiles—without requiring the Soviet Union to reduce a single weapon, nuclear or conventional. If the Soviet Union can achieve these and other objectives through the plaintiffs' activities, there is no incentive for it to reduce arms.

of their elected representatives. But the basic and important corollary is that the people may remove their elected representatives as they cannot dismiss United States Judges. This elementary fact about the nature of our system, which seems to have escaped notice occasionally must make manifest to judges that we are neither gods nor godlike, but judicial officers with narrow and limited authority. Our entire System of Government would suffer incalculable mischief should judges attempt to interpose the judicial will above that of the Congress and President, even were we so bold as to assume that we can make a better decision on such issues.

*Id.* at 799.

## CONCLUSION

The instant case presents a non-justiciable political question. It is therefore not necessary to reach the other asserted bases for dismissal, ripeness and standing.[12] Defendants' motion to dismiss the complaint is hereby granted.

SO ORDERED.

---

12. In their reply papers defendants further assert that plaintiffs have failed to state a claim upon which relief can be granted. This issue, however, is not the subject matter of the instant motion and is thus not properly before the court. Even if it were, however, the court need not reach the issue since the court finds that this case presents a non-justiciable political question.