Alan CRANSTON, et al., Plaintiffs,

v.

Ronald W. REAGAN, et al., Defendants.

Civ. A. No. 84–1545.

United States District Court,
District of Columbia.

June 20, 1985.

Eldon V.C. Greenberg, Galloway & Greenberg, Washington, D.C., for plaintiffs.

R. Lawrence Dessem, David J. Anderson, Vincent M. Garvey, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This action is brought by three members of Congress (one United States Senator and two United States Representatives)[1] and six self-described public interest organizations[2] against various individuals within the executive branch of the United States Government.[3] Each of the defendants was

---

1. Plaintiff Alan Cranston is a United States Senator and a member of the Senate Committee on Foreign Relations. Plaintiff Howard E. Wolpe and plaintiff Michael D. Barnes are United States Representatives and members of the House Committee on Foreign Affairs. Complaint ¶¶ 4–6.

2. The organizational plaintiffs are: the Nuclear Control Institute, the Union of Concerned Scientists, Greenpeace, U.S.A., the Natural Resources Defense Council, Inc., the Energy Research Foundation and Greenpeace, Sweden. The first

five of these are U.S. organizations; the sixth is based in Sweden. Complaint ¶¶ 7–12.

3. The defendants named are Ronald W. Reagan, President of the United States, George P. Schultz, Secretary of State of the United States, Donald P. Hodel, Secretary of Energy of the United States, Kenneth L. Adelman, Director, United States Arms Control and Disarmament Agency, and the Chairman and members of the United States Nuclear Regulatory Commission. The current Secretary of Energy is John S. Herrington.

allegedly involved in the negotiation, review, recommendation, and/or authorization of identical provisions of Agreed Minutes which are an integral part of the Agreement for Cooperation between the United States of America and Sweden Concerning Peaceful Uses of Nuclear Energy (the Swedish Agreement) and the Revised Agreement for Cooperation between the United States of America and Norway Concerning Peaceful Uses of Nuclear Energy (the Norwegian Agreement) (collectively "the Agreements"). Plaintiffs assert that these Agreements (in particular, the Agreed Minutes thereto) violate provisions of the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2282, as amended by the Nuclear Non-Proliferation Act of 1978 ("the NNPA"), Pub.L. No. 95–242, 92 Stat. 120 (Mar. 10, 1978), in that they grant the advance long term consent of the United States to the transfer by Sweden and Norway of spent nuclear reactor fuel for reprocessing at facilities in the United Kingdom and France, subject to certain limitations.

This action involves interpretation of the Atomic Energy Act/NNPA provisions concerning international management of spent nuclear reactor fuel. Spent fuel is nuclear reactor fuel that has been irradiated in a nuclear reactor in order to produce power through nuclear fission. The physics of the nuclear fission reaction need not be described here.[4] For our purposes, it will suffice to recognize a nexus between the civilian nuclear power process and the risk of proliferation of nuclear explosives. While spent fuel used in a civilian fission reactor cannot be directly fashioned into a nuclear explosive, it can be reprocessed to provide weapons grade plutonium suitable for nuclear weapons manufacture. Thus, a spent fuel management policy is essential to prevent diversion of nuclear materials into the hands of would-be weapons manufacturers.[5] One aspect of that policy under the Atomic Energy Act and NNPA is the focus of this case.

Plaintiffs seek a judicial determination that the Norwegian and Swedish Agreements violate certain spent fuel management provisions of the Atomic Energy Act as amended by the NNPA. They further seek a mandatory injunction requiring the Secretary of State of the United States and the Secretary of Energy of the United States to review *case by case* all transfers from Sweden and Norway of spent reactor fuel subject to the Agreements for purposes of reprocessing. Complaint at 27. Defendants have moved to dismiss the complaint on the grounds that (1) the case presents a nonjusticiable political question, (2) plaintiffs are without standing to sue, and (3) Congress intended to preclude judicial review of agreements for nuclear cooperation, including the Agreements at issue here.

*Statutory Background*

Under the Atomic Energy Act of 1954, an agreement for cooperation is the fundamental mechanism for nuclear cooperation between the United States and other nations or international organizations. Such bilateral agreements provide the framework for technical cooperation and for export of certain nuclear materials from the United States to nations abroad, and for safeguarding of exported items against theft, diversion or illicit use; moreover, an agreement for cooperation is a prerequisite to the licensing of certain nuclear exports. *See* Note, Nuclear Proliferation and Subsequent Arrangements for Retransfer for Reprocessing (hereinafter "Nuclear Proliferation"), 20 Va.J. Int'l L. 99, 100 n. 13 (1979), citing Library of Congressional Research Service, United States Agreements for Cooperation in Atomic Energy, prepared for Senate Comm. on Government Operations, 94th Cong., 2d Sess. (Comm. Print 1976) at CRS–24; *see also* 42 U.S.C. § 2153.

Section 123 of the Act, 42 U.S.C. § 2153, sets forth substantive and procedural re-

---

**4.** For a concise description of the process, see Note, Nuclear Proliferation and Subsequent Arrangements for Retransfer for Reprocessing, 20 Va.J. Int'l L. 99 (1979).

**5.** *Id.* at 102 n. 18.

quirements applicable to agreements for cooperation. Substantively, Section 123 as amended provides that a proposed agreement "shall include" nine particular elements. The mandatory elements at issue in this case are the following:

(5) a guaranty by the cooperating party that any material or any Restricted Data transferred pursuant to the agreement for cooperation and . . . any production or utilization facility transferred pursuant to the agreement for cooperation or any special nuclear material [6] produced through the use of any such facility or through the use of any material transferred pursuant to the agreement, will not be transferred to unauthorized persons or beyond the jurisdiction or control of the cooperating party without the consent of the United States.
. . . .

(7) [except in cases not here applicable] a guaranty by the cooperating party that no material transferred pursuant to the agreement for cooperation and no material used in or produced through the use of any material, production facility, or utilization facility transferred pursuant to the agreement for cooperation will be reprocessed, enriched or (in the case of plutonium, uranium 233, or uranium enriched to greater than twenty percent in the isotope 235, or other nuclear materials which have been irradiated) otherwise altered in form or content without the prior approval of the United States.

Complaint ¶¶ 26, 42.

Procedurally, section 123 allocates responsibilities and establishes steps for negotiation, review and approval of agreements for cooperation. Under this section, agreements are to be negotiated by the Secretary of State, "with the technical assistance and concurrence of the Secretary of Energy and in consultation with the Director of the Arms Control and Disarmament Agency" ("ACDA"). 42 U.S.C. § 2153(a). The President then is to consider the recommendations of these officials and of the Nuclear Regulatory Commission, as well as an unclassified nuclear proliferation assessment statement prepared by ACDA. *Id.* Presidential approval of an agreement requires a written determination by the President that "the performance of the proposed agreement will promote, and will not constitute an unreasonable risk to, the common defense and security." 42 U.S.C. § 2153(b). The Act also provides for Congressional review of agreements for cooperation: certain agreements (including the Norwegian and Swedish Agreements at issue here) must be "submitted to the Congress, together with the approval and determination of the President, for a period of sixty days of continuous session . . . and referred to the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate." 42 U.S.C. § 2153(d). Procedures for Congressional consideration of Presidential submissions are set forth at 42 U.S.C. § 2159. That section provides for consideration by the relevant committees and the respective Houses of Congress, debate, and passage of a concurrent resolution approving or disapproving the agreement under review. 42 U.S.C. § 2159(b)–(f). In keeping with *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), Congress cannot veto an agreement for cooperation by a concurrent resolution pursuant to this section.

Section 303 of the NNPA added to the Atomic Energy Act section 131, which deals with "subsequent arrangements" arising under agreements for cooperation, 42 U.S.C. § 2160. Such subsequent arrangements are entered into by the United States and another country after the agreement for cooperation between those parties takes effect, and may involve, *inter alia,*

[United States] approvals for the transfer, for which prior approval is required under an agreement for cooperation, by a recipient of any source or special nuclear material, production or utilization facility, or nuclear technology. . . .

6. "Special nuclear material" is defined at 42   U.S.C. § 2014(aa) (1976).

42 U.S.C. § 2160(a)(2)(B). Section 131 further provides that:

> (1) Prior to entering into any proposed subsequent arrangement under an agreement for cooperation ... the Secretary of Energy shall obtain the concurrence of the Secretary of State and shall consult with the Director, the Commission, and the Secretary of Defense: *Provided,* That the Secretary of State shall have the leading role in any negotiations of a policy nature pertaining to any proposed subsequent arrangement regarding arrangements for the storage or disposition of irradiated fuel elements or approvals for the transfer, for which prior approval is required under an agreement for cooperation, by a recipient of source or special nuclear material, production of utilization facilities, or nuclear technology. Notice of any proposed subsequent arrangement shall be published in the Federal Register, together with the written determination of the Secretary of Energy that such arrangement will not be inimical to the common defense and security, and such proposed subsequent arrangement shall not take effect before fifteen days after publication....

42 U.S.C. § 2160(a). If, in the view of the ACDA Director, a proposed subsequent arrangement "might significantly contribute to proliferation", he may prepare an unclassified risk assessment "to ensure that assistance to be furnished pursuant to the subsequent arrangement will not be used to further any military or nuclear explosive purpose." 42 U.S.C. § 2160(b). Preparation of an assessment statement may delay the Federal Register publication referenced in paragraph (a). 42 U.S.C. § 2160(a).

With regard to exports of certain nuclear materials from the United States to another country, section 131 further provides for submission by the Secretary of Energy to the House Committee on Foreign Affairs and the Senate Committee on Foreign Rela-

tions, at least 15 days of continuous session in advance of entry into any subsequent arrangement (except in emergency circumstances), of a report containing his reasons for approving any transfers to a third country for purposes of reprocessing. 42 U.S.C. § 2160(b)(1). In addition, if the subsequent arrangement is for the reprocessing of nuclear material or the retransfer of more than 500 grams of plutonium to a non-nuclear-weapon state, the Secretaries of Energy and of State must both determine that such reprocessing or retransfer will not significantly increase the risk of nuclear proliferation. 42 U.S.C. § 2160(b)(2) and (3). In making this judgment, the Secretaries must give "foremost consideration to whether or not the reprocessing or retransfer will take place under conditions that will ensure timely warning to the United States of any diversion well in advance of the time at which the non-nuclear-weapon state could transform the diverted material into a nuclear explosive device." *Id.*

*The Norwegian and Swedish Agreements and Plaintiffs' Claims*

In this action, plaintiffs contend that the statutory scheme outlined above, and specifically 42 U.S.C. §§ 2153 and 2160, require that decisions regarding transfer and reprocessing of spent nuclear reactor fuel be made subsequent to initial agreements for cooperation, in the context of case by case scrutiny of the proliferation risks associated with the particular materials being transferred. Plaintiffs' Memorandum at 3. On that basis they challenge the validity of the Norwegian and Swedish Agreements. By their terms, those Agreements permit Norway and Sweden to retransfer spent fuel to facilities in the United Kingdom and France for reprocessing throughout the 30–year life of the Agreements. The advance consent provisions are subject to some limitations and oversight by the United States,[7] but absent certain circumstanc-

---

7. For example, both Agreements provide that: "The understandings concerning fuel disposition may be terminated in whole or in part, if either party considers that exceptional circumstances

of concern from a non-proliferation or security standpoint so require; to the extent time and circumstances permit, the parties will consult prior to any such termination. Such circum-

es they do not call for case by case review of retransfers.

The Norwegian and Swedish Agreements are the product of some five years of negotiation, which included extensive discussions of the prior consent issue. The advance consent provisions in those Agreements reflect a policy change brought about by the Reagan administration: previous presidential administrations, both before and after the passage of the NNPA, considered requests to retransfer and reprocess irradiated fuel elements on a case by case basis as they arose. *See* Plaintiffs' Memorandum at 5. The Norwegian and Swedish Agreements—the first to include advance consent provisions—were adopted through the process prescribed by statute and outlined above; that is, the Agreements were reviewed by the Secretaries of State and Energy, and the Director of ACDA, and those officials submitted to the President statements, findings, and/or recommendations as required under the Act. Each of those officials specifically addressed the matter of advance consent to retransfers for reprocessing with respect to proliferation risks; each concluded that execution of the Agreements would be compatible with United States nonproliferation policy. The Director of ACDA further concluded that the proposed Agreements met all substantive requirements of the Atomic Energy Act and NNPA. *See* Swedish Message, *supra* n. 7 at 45; Norwegian Message, *supra*, n. 7 at 89. Upon review of those submissions, the Agreements, and the views of the Nuclear Regulatory Commission,[8] the President approved the Agreements and authorized their execution by memoranda dated November 21, 1983.

Swedish Message at 45; Norwegian Message at 41.

Pursuant to Section 123, 42 U.S.C. § 2153(d), the President submitted the Agreements, together with statements of the Secretaries of State and Energy, the Director of ACDA, and the NRC, to the Congress on January 26, 1984. During the 60 days of continuous session that followed, neither House of Congress held hearings or requested the views of any of the affected agencies and departments as provided for in the Act, nor did either House of Congress attempt to pass a concurrent resolution disapproving either of the Agreements or take any other legislative action to disapprove the Agreements. After passage of the 60-day period and after approval of the Swedish Agreement by the Swedish Government, on April 11, 1984, the United States and Sweden exchanged diplomatic notes bringing that Agreement into force. On June 5, 1984, the Parliament of Norway approved the Norwegian Agreement, and the diplomatic notes bringing this Agreement into effect were exchanged on June 2, 1984.

Defendants deny that the Norwegian and Swedish Agreements—including the advance consent provisions—run afoul of the Atomic Energy Act and NNPA. Leaving aside the merits of the case, defendants argue in the instant motion that plaintiffs' claim is of a nonjusticiable nature, that plaintiffs lack standing to pursue it, and that the statute precludes judicial review of the Agreements.

*Justiciability*

Defendants argue that plaintiffs' attempt to invalidate the advance consent

---

stances include, but are not limited to, a determination by either party that the foregoing understandings cannot be continued without a significant increase of the risk of proliferation or without jeopardizing its national security." See January 26, 1984 Presidential Message: "Cooperation Concerning Peaceful Uses of Nuclear Energy Between United States and Sweden," ("Swedish Message") at 37; January 26, 1984 Presidential Message: "Revised Agreement for Cooperation Concerning Peaceful Uses of Nuclear Energy Between the United States and Norway," ("Norwegian Message") at 35. Both Presi-

dential messages are contained in the Appendix filed with Defendants' Motion to Dismiss.

**8.** The NRC stated that it "[did] not object" to the proposed Agreements "in view of the advanced state of [the] negotiations ... and the nonproliferation credentials of the country involved." The Commission's message to the President noted that two Commissioners were concerned by the 30-year advance consent provisions. Norwegian Message at 99–100; Swedish Message at 102–103.

provisions of the Norwegian and Swedish Agreements presents a nonjusticiable political question. In defendants' view, this case places at issue United States nuclear nonproliferation policy and foreign relations, matters best (and necessarily) left to the political branches of government.

*Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) supplies the standards for identifying nonjusticiable political questions. That case sets forth six separate formulations:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710; *see also Consumer Energy, Etc. v. FERC,* 673 F.2d 425, 452 (D.C.Cir.1982), *aff'd* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 77 L.Ed.2d 1403, 77 L.Ed.2d 1413 (1983); *Sanchez-Espinoza v. Reagan,* 568 F.Supp. 596, 599 (D.D.C.1983); *Crockett v. Reagan,* 558 F.Supp. 893, 898 (D.D.C.1982), *aff'd* 720 F.2d 1355 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). If any one or more of these conditions is inextricable from the case at bar, dismissal for nonjusticiability under the political question doctrine may well be appropriate. *Greenham Women Against Cruise Missiles v. Reagan,* 591 F.Supp. 1332 (S.D.N.Y.1984), *aff'd* 755 F.2d 34 (2d Cir.1985); *see also Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710.

The *Baker v. Carr* criteria may be grouped and stated as three inquiries:

> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?

*Goldwater v. Carter,* 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring); *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500 (D.C.Cir. 1984), *vacated on other grounds sub nom. Weinberger v. Ramirez,* —— U.S. ——, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). Turning to the first of these, defendants contend that plaintiffs' claim raises issues of nuclear nonproliferation policy which concern both national security and foreign policy matters generally committed to the political branches of government. Given the statutory provision for executive negotiation and approval and legislative review of agreements for cooperation, defendants argue, judicial review of the Norwegian and Swedish Agreements would be particularly inappropriate.

At one level of analysis, plaintiffs' claim certainly relates to foreign policy and national security; however, "it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance." *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706; *Ramirez de Arellano v. Weinberger,* 745 F.2d at 1512; *see also Adams v. Vance,* 570 F.2d 950, 954 (D.C.Cir.1978). Plaintiffs do not call for a judicial determination of what nuclear nonproliferation policy should be, or whether the United States would be wise to export nuclear materials to Norway and Sweden under any particular agreement of cooperation. The sole question presented here is whether a statutory scheme with specific provisions governing "subsequent arrangements" to agreements for cooperation—including arrangements for retransfers which require prior approval under an agreement—will permit advance consent for retransfers as an element of the agree-

ment itself. The issue is one of statutory interpretation, a matter within the province of the Courts. *See generally Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243, ___ n. 25, 104 S.Ct. 1776, 1785 n. 25, 80 L.Ed.2d 273 (1984) (issue of whether agency order is inconsistent with Warsaw Convention does not raise political question). The fact that plaintiffs seek as a *remedy* the abrogation of international agreements does not bear on whether the *issues* to be adjudicated are political in nature, although the consequences of judicial action (*i.e.* the grant of a remedy) may be relevant under another formulation of the political question test. *See Greenham Women Against Cruise Missiles v. Reagan*, 591 F.Supp. at 1335–36, *but see affirmance*, 755 F.2d at 37; *see also Ramirez de Arellano v. Weinberger* 745 F.2d at 1512–15; *id.* at 1547 and n. 5 (Tamm, J., dissenting).

The nature of the remedy sought is, in this case, directly relevant to the category of *Baker v. Carr* criteria labelled "prudential considerations". *See generally Goldwater v. Carter*, 444 U.S. at 998, 100 S.Ct. at 534. These considerations—the need to maintain respect for coordinate branches of government, the need for adherence to a political decision already made, and the interest in avoiding the embarrassment of "multifarious pronouncements", *see* Wright, Federal Courts at 77 (1933)—would all be called into play by a decision to set aside agreements which are the product of delicate and extensive international negotiation. Defendants correctly point out that an about-face on the advance consent issue at this time would damage United States credibility in the civilian nuclear arena and undermine United States efforts to persuade other nations of our views on nonproliferation. As the Court of Appeals for this Circuit has stated in another context:

> This country's interests in regard to foreign affairs and international agreements may depend on the symbolic significance to other countries of various stances....

*Adams v. Vance*, 570 F.2d 950, 955 (D.C. Cir.1977). The challenged Agreements in-

corporating the United States' stance as to advance consent have progressed through the political processes of three nations and taken effect. Were this Court to adopt a new stance, "ignoring the delicacies of diplomatic negotiation, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President", *Mitchell v. Laird*, 488 F.2d 611, 616 (D.C. Cir.1973), the "symbolic impact" would be grave indeed. *See Adams v. Vance*, 570 F.2d at 956; *see generally Sanchez-Espinoza v. Reagan*, 568 F.Supp. at 600.

Defendants further observe that under customary international law, a party may not invoke the provisions of its internal law as justification for disregarding the terms of an international agreement. *See* Restatement (Second) of Foreign Relations Law of the United States §§ 138, 140 (1965). The reasons for this custom are self-evident. In this case, unilateral modification of the Norwegian and Swedish Agreements could well convey the message that in the eyes of the United States, nonproliferation agreements need not be taken seriously. Nothing could be further from the truth.

In sum, this is a case in which the legal issues presented fall within the Court's province to decide, but the "possible consequences of judicial action" render the case nonjusticiable. *See Baker v. Carr*, 369 U.S. at 211–12, 82 S.Ct. at 706–07; *Greenham Women Against Cruise Missiles v. Reagan*, 591 F.Supp. at 1339; *Atlee v. Laird*, 347 F.Supp. 689, 705 (E.D.Pa.1972) (three-judge panel), *aff'd sub nom. mem. Atlee v. Richardson*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *see also Ramirez de Arellano v. Weinberger*, 745 F.2d at 1547 (Tamm, J., dissenting). The concerns underlying this complaint could have been aired *before* execution of the Norwegian and Swedish Agreements through enactment of a Congressional concurrent resolution, *see* 42 U.S.C. § 2153(d); however, neither House of Congress protested the inclusion of the advance consent provisions, despite their statutorily-guaranteed oppor-

tunity to do so. Accordingly, at this late hour the Court will not disturb the "single-voiced statement of the Government's views" on this issue. *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706.

### Conclusion

Because this case presents a nonjusticiable political question, the Court need not reach the remaining issues raised in defendants' motion to dismiss, standing and statutory preclusion of judicial review. Parenthetically, even if the Congressional plaintiffs had standing to bring this action, the Court would deny the requested relief in an exercise of remedial discretion. *See e.g., Moore v. U.S. House of Representatives,* 733 F.2d 946, 954–55 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Riegle v. Federal Open Market Committee,* 656 F.2d 873, 881 (D.C.Cir.1981), *cert denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Sanchez-Espinoza v. Reagan,* 568 F.Supp at 600–01 n. 5; *Crockett v. Reagan,* 558 F.Supp. at 902–03, *aff'd* 720 F.2d at 1355; *cf. United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375 (D.C.Cir. 1984).[9]

Accordingly, and for the reasons set forth above, it is by the Court this 20th day of June, 1985

ORDERED that defendants' motion to dismiss the complaint on the basis of nonjusticiability is hereby granted, and this case stands dismissed.

**9.** Both the political question doctrine and the doctrine of remedial discretion turn on separation of powers concerns, which do not enter into the standing inquiry. *See Moore v. U.S. House of Representatives,* 733 F.2d at 954; McGowan, Congressmen in Court: The New

Plaintiffs, 15 Ga.L.Rev. 241 (1981); *see generally Baker v. Carr,* 369 U.S. at 210, 82 S.Ct. at 706 ("the nonjusticiability of a political question is primarily a function of the separation of powers").